128 N.J. Super. 402 (1974)
320 A.2d 203
JULIA A. CRIST AND AMERICA MERCADO, ON BEHALF OF THEMSELVES, AS PARENTS AND GUARDIANS OF THEIR CHILDREN AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
THE NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES AND THE JUVENILE AND DOMESTIC RELATIONS COURT OF CAMDEN COUNTY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 25, 1974.
*404 Mr. Carl S. Bisgaier for plaintiffs (Mr. Allen S. Zeller and Mr. Wayne Bryant, of counsel; Camden Regional Legal Services, Inc.).
Mr. Charles R. Parker for defendants (Mr. William F. Hyland, Attorney General of New Jersey and Mr. George F. Kugler, Jr., former Attorney General).
KING, J.C.C., Temporarily Assigned.
This is an action instituted to test whether indigent parents who are threatened with removal of children from the home by a public agency are constitutionally entitled to counsel free of charge under the Federal Constitution. The Attorney General opposes plaintiffs, urging that the right to free counsel in this context is not a fundamentally protected right under the federal Due Process Clause or the Equal Protection Clause, and contends that the matter is one of exclusively legislative and/or executive concern. Although the question is one of first impression in New Jersey, the issue has been the subject of substantial judicial consideration in other jurisdictions.
This suit was precipitated by actions commenced by the Division of Youth and Family Services (DYFS) against the various plaintiffs under N.J.S.A. 30:4C-1 et seq. Concerned with "Dependent and Neglected Children," this chapter expresses the public policy of the State to be: "* * * that the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare. * * *" N.J.S.A. 30:4C-1. In this instance the proceedings for custody of the children of the various plaintiffs were commenced by DYFS under N.J.S.A. 30:4C-12, which provides for a proceeding in the Juvenile and Domestic Relations Court before placing a child in the Division's custody for a period of up to six months. Such an order may be extended in a summary hearing upon application by the Division and notice to the parents. This chapter further provides that the Division may proceed in an appropriate situation to obtain an order terminating parental *405 rights and committing the child to the guardianship and control of the Division. N.J.S.A. 30:4C-20. There is no provision in the chapter providing for court-appointed counsel for indigent parents.
This action is brought by four plaintiffs who have been the subject of proceedings under the statute. On December 18, 1972 plaintiff Crist's child was removed from her home under an order of the Juvenile and Domestic Relations Court. In April and May of 1973 ten children were removed from plaintiff Mercado's home as a result of agency action. Plaintiff Crist's child was returned on July 20, 1973. Two of plaintiff Mercado's children still remain in foster placement. The Tazewells' seven children were removed pursuant to court order on February 15, 1974. On February 16, 1974 five children were returned but two children remain in foster care, and the Tazewells have requested a court date for formal hearing on the custody issue. All plaintiffs are represented in this proceeding by Camden Regional Legal Services, Inc., which office asserts that it is without the funds or facilities to represent all persons similarly situated. Camden Regional Legal Services, Inc. asserts that its office should not be required to represent indigent persons entitled to court-appointed counsel as a matter of right. All parties have moved for summary judgment on the pleadings and affidavits. Both plaintiff Crist and plaintiff Mercado have heretofore been represented by Camden Regional Legal Services during the custody proceedings already concluded. Plaintiffs Tazewell remain unrepresented in the custody proceeding and are awaiting a hearing. Plaintiffs Tazewell clearly have standing to raise the question presented.
Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome to the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663, 678, as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in *406 a form historically viewed as capable of judicial resolution." [Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972)]
Plaintiff Crist would seem to have no standing because her child was returned. As to her this action is dismissed. Since plaintiff Mercado may not in fact be able to secure the continued representation of Camden Regional Legal Services, Inc., and two of her children remain in the temporary custody of the State, she would appear to have the requisite standing to maintain this action.
The claim here presented has been the subject of a number of decisions in other states during the past seven or eight years, undoubtedly the product of the "poverty law explosion" and the United States Supreme Court's recognition of an expanded class of fundamental rights not specifically enumerated in the Bill of Rights, e.g., Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The first decision touching on the problem was Chambers v. District Court of Dubuque Cty., 261 Iowa 31, 152 N.W.2d 818 (Sup. Ct. 1967) see also Orcutt v. State, 173 N.W.2d 66 (Iowa Sup. Ct. 1969). In a proceeding to terminate parental rights under a 1965 Iowa statute the parent had been provided with free counsel at the trial level as required by the statute. While the statute was silent as to the right to free counsel and a free transcript on appeal, the court found that both such rights inured to the parent, basing its decision on state grounds of statutory construction. In Chambers the Iowa Supreme Court felt that In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), strengthened its grounds for decision, but specifically avoided a finding of federal constitutional compulsion.
Next follows the decision of the Supreme Court of Minnesota, In re Karren, 280 Minn. 377, 159 N.W.2d 402 (1968). The parent had failed to retain custody of the child and petitioned the Supreme Court of the state for an order compelling the court below to provide a transcript of the trial proceedings for appeal purposes at public expense. The parent *407 had been represented by the Legal Aid Society, which also provided counsel for her appeal, so there was no right to counsel issue. Plaintiff was a welfare client and the welfare department actually acquiesced in her application to compel the department to expend monies on the transcript. The Minnesota Supreme Court relied on Chambers v. District Court of Dubuque Cty., supra, and stated: "We are of the opinion that the circumstances here compel a finding as a matter of law that a transcript is a necessity which must be paid for out of appropriate welfare funds." (at 403).
Again, the basis for decision was controlled by the state court's interpretation of the local statutory scheme where no specific section of the statute provided for a free transcript, and the grounds for decision were not of a federal constitutional nature. The Minnesota court, mirroring the Iowa court in Chambers, did mention its sensitivity to the Gault decision, stating:
Although the [Gault] court did not find it necessary to decide whether an indigent delinquent must be furnished a free transcript, the opinion strongly underscores the necessity for according litigants in juvenile court all of the procedural due process customarily granted to defendants in criminal court. [Id. at 404]
One month after In re Karren, supra, the Oregon Supreme Court issued the first opinion clearly placing the indigent parent's right to free counsel on a federal constitutional basis. State v. Jamison, 251 Or. 114, 444 P.2d 15 (1968). In holding that where the parent in a termination proceeding is indigent, counsel must be supplied at public expense as a matter of due process, the court expressed the reasons for being so motivated:
The permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants. It would be unconscionable for the state forever to terminate the parental rights of the poor without allowing such parents to be assisted by counsel. Counsel in juvenile court must be made available for parents and children alike when the relationship of parent and child is threatened by the state. [at 17]
*408 Once more Gault was a springboard for the court's finding. The Oregon court indicated that "the indigent are frequently the least able to cope with government in its official functions." Id. This observation concerning the tremendous imbalance between the parties in such a grave matter most certainly accords with this court's own personal experience in dealing with these matters. The Oregon court also was unimpressed by the civil-criminal dichotomy as controlling the denial of counsel below remarking, "the consequences of the denial of counsel are as serious as they are in most criminal prosecutions." Id.
The trend was temporarily reversed by a decision of an intermediate court of appeal in California in 1970. Robinson v. Kaufman, 8 Cal. App.3d 783, 87 Cal. Rptr. 678 (D. Ct. App. 1970), cert. den., 402 U.S. 964, 91 S.Ct. 1624, 29 L.Ed.2d 128 (1971), found no statutory or constitutional right to appointed counsel for either parent or child in a dependency or termination of rights proceeding. The court was unimpressed by Gault, choosing to limit its impact to situations where the traditional criminal sanction of incarceration against the child could be imposed. Essentially the case was considered by the California court as no different than a routine child custody battle between parents.
The United States Supreme Court denied a petition for certiorari in that case over dissents by Mr. Justice Black and Mr. Justice Douglas. Kaufman v. Carter, 402 U.S. 964, 91 S.Ct. 1624, 29 L.Ed.2d 128 (1971). It is clear from the dissenting opinions that these two members of the court felt that the right of counsel in this type of proceeding was of a compelling and fundamental character which should be recognized under the Due Process and Equal Protection Clauses. Justice Douglas remarked: "Courts ought not be a private preserve for the affluent." 402 U.S. 964, 91 S.Ct. 1624, 29 L.Ed.2d 127. Of course, denial of certiorari by the Supreme Court is not authoritative in any sense as to its ultimate attitude on the merits of the decision of the California court below. Maryland v. Baltimore Radio Show, *409 338 U.S. 912, 919, 70 S.Ct. 252, 94 L.Ed. 562 (1950); Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).
The decision of the intermediate California court in Robinson v. Kaufman, supra, was followed in In re T, 25 Cal. App.3d 120, 101 Cal. Rptr. 606 (D. Ct. App. 1974). The court again stressed the civil-criminal dichotomy and refused to be influenced by the Gault approach. However, a California Federal District Court refused to accept the two state-court rulings as persuasive on federal constitutional grounds and held that the parent was entitled to free counsel as a matter of federal right. The court felt the inherent gross imbalance of expertise created a fundamentally unfair situation and that the only state interest was in avoiding expense, which is not a compelling local interest. Cleaver v. Wilcox, 40 U.S.L.W. 2658 (N.D. Cal. 1972) (otherwise unreported).
In 1972 the problem was considered by the Court of Appeals of New York, In re B, 30 N.Y.2d 352, 334 N.Y.S.2d 133, 285 N.E.2d 288 (1972). The parent was indigent and the case reached this high court on the question of waiver of her right to counsel. No provision appeared in the controlling statute requiring the appointment of counsel for an indigent parent. The court found no waiver of counsel present. On the issue of the right to appointed counsel the court appeared to assume that such right existed. Indeed, from the opinion it is difficult to conclude that any opposition on this point was made by the attorney-general of the state who appeared on the appeal, and the actual party in interest, the Commissioner of Social Welfare Services of Westchester County, did not dispute the parents' right to have free counsel. Chief Judge Fuld stated:
In our view, an indigent parent, faced with the loss of a child's society, as well as the possibility of criminal charges is entitled to the assistance of counsel. A parent's concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right to be relinquished to the State without the opportunity *410 for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer. To deny legal assistance under such circumstances would  as the courts of other jurisdictions have already held [citations omitted]  constitute a violation of his due process rights and, in light of the express statutory provision for legal representation for those who can afford it, a denial of equal protection of the laws as well. [334 N.Y.S.2d at 136, 285 N.E.2d at 290]
In 1973 the highest courts of Nebraska and Maine followed the New York Court of Appeals in recognizing the right to assigned counsel as fundamental. To support its view, the Maine high court carefully reviewed its concept of the compelling constitutional history, ranging from Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922) (right to teach German language to children in grade school) to Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924), where, in upholding the right to educate children in a parochial school, Justice McReynolds stated: "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations" (268 U.S. at 535, 45 S.Ct. at 573); to Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The practical problems of litigation with unrepresented parents was well recognized in the Maine opinion which said as follows:
In a neglect proceeding the full panoply of the traditional weapons of the state are marshalled against the defendant parents. The Department is designated to represent the State at the hearing but may, at its option, request that the County Attorney represent the State as he would in criminal prosecutions. The Department has access to public records concerning the family, the services of professional social workers to investigate the family situation and to give testimony at the hearing and the Department's representative at the hearing has knowledge and experience in legal proceedings, subpoena powers, familiarity with the law of evidence, and the ability to examine witnesses.
The crucial issues in a neglect proceeding may be difficult to grasp and consequently difficult to refute for an uneducated and unsophisticated layman. The expert testimony presented by the Department may include that of psychologists whose jargon is usually beyond the *411 understanding of the ordinary person. The statement in Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that "even the intelligent and educated layman has small and sometimes no skill in the science of law" would apply to neglect proceedings in the same manner as it applied to criminal prosecutions. The average parent would be at a loss when faced with problems of procedure, evidence, or with cross-examination. Statistical studies conducted in other jurisdictions indicated markedly different results between neglect proceedings where the parent has assistance of counsel and those proceedings where the parent is without counsel. See Note, Child Neglect: Due Process for the Parent, 70 Colum. L. Rev. 405, 476 (1970). We agree with the Oregon Supreme Court that for most parents involved in neglect actions "the entire proceedings [are] incomprehensible." State v. Jamison, 251 Or. 114, 444 P.2d 15 (1968).
The neglect proceeding is accusatory inasmuch as the Department is attempting to demonstrate that the parents' conduct has failed to measure up to a socially and legally acceptable norm. Indeed, testimony as to conduct resulting in a finding of neglect might also be the basis of criminal prosecution.
In criminal prosecutions where imprisonment was to be imposed, the parent would be entitled to counsel under Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). We cannot dismiss the possibility that a parent appearing in a neglect hearing without the assistance of counsel might make self-incriminatory statements that could result in a criminal prosecution. [Danforth v. State Dept. of Health & Welfare, Me., 303 A.2d 794, 799 (Sup. Jud. Ct. 1973)]
Relying principally on the New York Court of Appeals, the Nebraska high court recognized the procedural due process right to appointed counsel. In interest of Friesz, 190 Neb. 347, 208 N.W.2d 259 (Sup. Ct. 1973).
Also of interest to the court are certain statistics available from a study of child neglect cases published in 4 Columbia Journal of Law and Social Problems 230, 242-3 (1968). These statistics show the following conclusions:

 Parents
 Unrepresented by
Disposition Represented by Counsel Counsel
Children placed outside
the home. 18.2% 40.6%
Discharged under court
supervision. 45.4% 39.6%
Discharged without court
supervision. 9.1% 5.0%

*412
Petition dismissed after
findings. 9.1% 3.0%
Other. 18.2% 11.8%

The conclusions to be draw from these statistics are aptly drawn by the following commentator.
Since there is no evidence indicating that the average respondent who can retain counsel is better or less neglectful than one who cannot, the conclusion seems inescapable that a significant number of cases against unrepresented parents result in findings of neglect solely because of the absence of counsel. In other words, assuming a basic faith in the adversary system as a method of bringing the truth to light, a significant number of neglect findings (followed in many cases by a taking of the child from his parents) against unrepresented indigents are probably erroneous. It would be hard to think of a system of law which works more to the oppression of the poor than the denial of appointed counsel to indigents in neglect proceedings. [Note: "Child Neglect: Due Process for the Parent," 70 Columb. L. Rev. 465, 476 (1970)]
New Jersey courts have recognized the parent's fundamental interest in the care and custody of children. These statements demonstrate a degree of sensitivity to the relationship which, in conjunction with the stated statutory purpose of "preserving and strengthening family life ...," N.J.S.A. 30:4C-1, merit consideration in evaluating the magnitude of the alleged fundamental involved. In a contested adoption proceeding Judge Lewis stated:
The name of an adopted child and his right of inheritance are changed and the biological ties with his parents are forever foreclosed by a judgment of adoption. Such an action is of the first magnitude and should be sanctioned only after serious consideration of the consequences. * * * The child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction. [In re N., 96 N.J. Super. 415, 425 (App. Div. 1967)]
This language was specifically quoted with approval by an unanimous Supreme Court in a contested adoption decision, In re Adoption of Children by D, 61 N.J. 89, 93 (1972).
The Supreme Court commented, when allowing an application over the parent's religious objections, to transfuse a *413 baby: "Concededly, freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme." State v. Perricone, 37 N.J. 463, 472 (1962). The right of the parents to the integrity of the family, absent a proven compelling governmental interest, is well established under state law.
The United States Supreme Court clearly recognized that the parent's rights to custody of children and the protection of the integrity of the family from arbitrary governmental action was one of fundamental constitutional due process in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The court required the State of Illinois to provide an administrative hearing to establish the unfitness of a parent prior to removing children from the custody of their unwed father. The Illinois procedure had presumed the unwed father unfit and made no provision for notice or a hearing on the subject of fitness. Justice White noted the growth of the Court's protection of the integrity and privacy of the family as follows:
The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." Kovacs v. Cooper, 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513, 527, 10 A.L.R. 2d 608 (1949) (concurring opinion.)
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 1045, 29 A.L.R. 1446 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942), and "[r]ights far more precious ... than property rights," May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221, 1226 (1953) "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can either supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, *414 88 L.Ed. 645, 652 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, 262 U.S. at 399, 43 S.Ct. at 626, 67 L.Ed. at 1045, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. at 1660, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510, 522 (1965) (Goldberg, J., concurring).
Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, but illegitimate, children a wrongful death action for the death of their mother, emphasizing that such children cannot be denied the right of other children because familial bounds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. Levy v. Louisiana, 391 U.S. 68, 71-72, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436, 439 (1968). [405 U.S. at 651, 652, 92 S.Ct. at 1212, 31 L.Ed.2d at 558-559]
The right to counsel question was not pressed in Stanley but the court made it clear that "at the least, Stanley's interest in retaining custody of his children is cognizable and substantial." 405 U.S. at 652, 92 S.Ct. at 1213, 31 L.Ed.2d at 559. The state was held to have no interest in separating the family without a fitness hearing, and Justice White noted that "[i]f Stanley is a fit father, the state spites its own articulated goals when it needlessly separates him from his family." Id.
The question then becomes whether this court, when dealing with an apparently universally recognized fundamental right, should hold that due process and equal protection require the extension of that right to encompass appointed counsel for indigent parents. The fabric of local law appears to strongly suggest that it should. Our courts have been most solicitous in requiring the appointment of counsel in matters of serious legal consequence to the economically unfortunate. The court is not convinced that the anticipated benevolence and social expertise of DYFS, or the label of "civil proceeding" as opposed to criminal, should control over the need for a meaningful and counseled adversary hearing in such serious a matter.
*415 Obviously, the persons most likely to be subjected to a termination of parental rights or custody proceeding are frequently on the lesser end of the scale of intelligence and resourcefulness. Sometimes these termination proceedings may be a preliminary forum to a criminal proceeding against the parents. In some instances it is necessary to deal with a compendium of sociological, psychological, or medical data, well beyond the ken of the ordinary layman. For the State to intrude permanently or only temporarily in a manner designed to disassemble the nuclear family, society's most basic human and psychological unit, without affording counsel and guidance to a class of society's least equipped adversaries strikes the court as a fundamental deprivation of procedural due process. This principle was discussed by the Supreme Court of this State in Rodriguez v. Rosenblatt, 58 N.J. 281 (1971), which anticipated the decision of the United States Supreme Court in Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972):
The importance of counsel in an accusatorial system such as ours is well recognized. If the matter has any complexities the untrained defendant is in no position to defend himself and, even where there are no complexities, his lack of legal representation may place him at a disadvantage. The practicalities may necessitate the omission of a universal rule for the assignment of counsel to all indigent defendants and such omission may be tolerable in the multitude of petty municipal court cases which do not result in actual imprisonment or in other serious consequence such as the substantial loss of driving privileges. But, as a matter of simple justice, no indigent defendant should be subjected to a conviction entailing imprisonment in fact or other consequence of magnitude without first having had due and fair opportunity to have counsel assigned without cost. [at 295]
These cases involved relatively short terms of confinement for disorderly persons offenses. The court in Rodriguez extended the right to free representation to "other serious consequence such as the substantial loss of driving privileges," and also spoke of "imprisonment in fact or other consequence of magnitude." It is difficult to conceive of the loss of driving privileges to be more serious than the loss of one's children. *416 Indeed, it is difficult to consider many consequences of greater magnitude than the loss of one's children. Therefore, this court holds that indigent parents subjected to dependency proceedings looking towards temporary custody or permanent termination of parental rights are entitled to counsel free of charge.
Since the proceeding for temporary custody is frequently a prelude to a petition to terminate parental rights, or failure in a temporary custody proceeding may permanently discourage further interest in a final termination proceeding, there is equal justification for legal representation at the earlier, temporary state of the proceeding.
The controlling legislation defines the term "welfare services" to include consultation, counselling and utilization of available resources" for the purpose of determining and correcting or adjusting matters and circumstances which are endangering the welfare of a child, and for the purpose of promoting his proper development and adjustment in the family and the community." N.J.S.A. 30:4C-2. The statute further provides for the financial sharing of costs, exclusive of medical costs, between the state and county on a 75%-25% ratio. Thus, the Legislature has by statute allocated the burden of the expense incurred by DYFS in fulfilling its statutory function. It would therefore seem most appropriate that the DYFS compensate necessarily required counsel to represent the indigent parents in this proceeding, and the Division is ordered to do so. See State v. Rush, 46 N.J. 399, 414 (1966), in which the Chief Justice stated that the expense of defense counsel was a "necessary expense" of the prosecution and was the burden of the county, the political entity required by law to prosecute crimes. "Within that category must fall the expense of providing counsel for an indigent accused, without which a prosecution would halt and inevitably fail under Gideon v. Wainwright, supra, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799." Id. at 414-415. The expense of counsel for the parents will therefore be *417 borne by DYFS according to the statutory scheme encompassing other "necessary expenses," and counsel shall be appointed by the Juvenile and Domestic Relations Court upon the request of plaintiffs.
The ruling is to apply prospectively only. Where the child has been removed by a temporary order the parents are entitled to counsel at a further hearing for continued custody or termination of parental rights. In those situations where rights have previously been terminated and a new and hopefully permanent psychological environment established for the child, the court feels that the effect on the administration of justice as well as the potential conflicts which could be generated for the children outweighs the desirability of retroactivity. Cf. Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); see Goldstein, Freud & Solnit, Beyond the Best Interests of the Child. (The Free Press, 1973). Summary judgment is entered against DYFS.