155 P.3d 682

**In the Interest of D.W.**

**No. 27853.**

Intermediate Court of Appeals of Hawai'i.

April 4, 2007.

Mary Ann Barnard, Honolulu, on the briefs, for Plaintiff–Appellant.

Korrine S.S. Oki and Mary Anne Magnier, Deputy Attorneys General, on the briefs, for Defendant–Appellee.

BURNS, C.J., LIM and FUJISE, JJ.

Opinion of the Court by BURNS, C.J.

The mother (Mother) of D.W., born on December 31, 2004, appeals from (1) the January 31, 2006 Order Awarding Permanent Custody that, pursuant to Hawaii Revised Statutes (HRS) §§ 587–2 and 587–73 (Supp. 2006), divested Mother's parental and custodial duties and rights, and awarded permanent custody of D.W. to the State of Hawai'i Director of Human Services, and (2) the February 22, 2006 Orders Concerning Child Protective Act that denied Mother's motion for reconsideration. Both orders were entered in the Family Court of the First Circuit.[1] We affirm.

A November 7, 2003 memorandum from the Family Court of the First Circuit to "FAMILY COURT PRACTITIONERS" announced that:

1. Judge Linda K.C. Luke presided.

Two pilot courtrooms will soon begin operating under the **Family Court Ho'olōkāhi Program (E Ho'olōkāhi a Malama ka 'Ohana—"bring about peace and harmony in caring for the family").** These two courtrooms will test new procedures designed to:

. . . .

design legal consultation for parents that will be less than "full representation" but will ensure competent consultation, promote family preservation, avoid conflicts of confidentiality, preserve the neutrality of the court, and remain within the current budget allotted by the Legislature (i.e., "unbundled" legal resources or "limited representation")

design guardian ad litem and legal services for parents to incorporate more paraprofessional assistance

. . . .

*The Roles of the Guardians Ad Litem (G.A.L.) and Consulting Attorneys*

With no reasonable expectation of increased funding for guardians ad litem and parents' counsel in H.R.S. Chapter 587 cases in the near future, the Family Court has been searching for a workable model, to provide services that would competently assist the family and that would fairly compensate the G.A.L.'s and attorneys.

. . . .

"Unbundling" or "limited representation" is a concept that has taken root in our country in response to the unmet legal needs of lower income persons. Different jurisdictions have developed different models; no one model has gained "high ground" over others.

In the area of dependency cases (*i.e.,* 587 cases), a version of "unbundling" has occurred with guardian ad litem and attorney groups organized to mimic large full-sized law firms. That is, attorneys appear in court and act as case managers in close concert with paraprofessionals doing much of the supporting work.

In this pilot project, we will be experimenting with using more non-attorney guardians ad litem who will have access to

attorney managers as well as paraprofessional support staff.

The full representation model for parents' attorneys, from the beginning to the end of a case, is not working well at this time. We will be experimenting with the appointment of "consulting attorneys" for parents who will then proceed on a pro se basis. Each courtroom will work with one of two mothers' consulting attorneys and the two courtrooms will work with one fathers' consulting attorney.

The court will appoint consulting attorneys to eligible parents, consistent with the best interest of the child. The consulting attorneys will work with these parents only at the courthouse. At the initial hearing, consulting attorneys will assist with the parents' orientation to the legal process. They will explain the role of the consulting attorney. They will also assist the parents to decide whether to request an adjudication trial. If an eligible parent requests a trial, the court will appoint a different attorney who will provide full representation to that parent for trial purposes until discharged by the court. Except for trial purposes, the consulting attorneys will assist parents with court appearances and legal advice regarding court proceedings as well as agreements reached through 'Ohana Conferencing, the JPA's, (Judicial Pre-trial Assistants) and/or the court.

Another part of the **Hoʻolōkāhi** Program is to test the workability of courtroom "teams". Many jurisdictions on the Mainland have found that court management of dependency cases works better when specific attorneys/firms are "assigned" to particular courtrooms. While everyone is expected to fulfill their roles to the utmost, these other jurisdictions are finding that the team concept is more efficient and, more importantly, works better for the families because of the increased efficiencies.

Besides ensuring that becoming a "team" does not mean relinquishing independence or zeal, the **Hoʻolōkāhi** Program will also apply the professional ethical values of ensuring competency of G.A.L.'s and consulting attorneys (as measured by standards of reasonableness and good faith), striving for fully informed parties, protection of confidences and against actual conflicts, avoiding unauthorized practice of law, and preserving the neutrality of the court.

Lolita Pahed was D.W.'s court appointed Guardian Ad Litem. Attorney John Choi was Mother's court-appointed pre-trial "consulting counsel" (Consulting Counsel). He also was Mother's court-appointed trial and post-trial counsel. The order awarding foster custody of D.W. to the State of Hawaiʻi Department of Human Services (DHS) was entered on January 10, 2005. The Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan was filed on June 30, 2005. The trial was held on December 16, 2005. The Findings of Fact and Conclusions of Law were entered on February 22, 2006.

In the opening brief, Mother contends that "[i]n a trial to divest a parent of that parent's fundamental right to custody and control of their child due process mandates full representation of counsel." In support of this contention, she cites *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). However, in *Lassiter*, the United States Supreme Court stated in part:

> In sum, the Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

### B

The case of *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the

government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551. Here the State has sought not simply to infringe upon that interest but to end it. If the State prevails, it will have worked a unique kind of deprivation. *Cf. May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221; *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62. A parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is, therefore a commanding one. FN3

Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed counsel. If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal. North Carolina itself acknowledges as much by providing that where a parent files a written answer to a termination petition, the State must supply a lawyer to represent the child. N.C. Gen.Stat. § 7A–289.29 (Supp.1979).

The State's interests, however, clearly diverge from the parent's insofar as the State wishes the termination decision to be made as economically as possible and thus wants to avoid both the expense of appointed counsel and the cost of the lengthened proceedings his presence may cause. But though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the "potential costs of appointed counsel in termination proceedings is [sic] admittedly *de minimis* compared to the costs in all criminal actions."

Finally, consideration must be given to the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel. North Carolina law now seeks to assure accurate decisions by establishing the following procedures: A petition to terminate parental rights may be filed only by a parent seeking the termination of the other parent's rights, by a county department of social services or licensed child-placing agency with custody of the child, or by a person with whom the child has lived continuously for the two years preceding the petition. § 7A–289.24. A petition must describe facts sufficient to warrant a finding that one of the grounds for termination exists, § 7A–289.25(6), and the parent must be notified of the petition and given 30 days in which to file a written answer to it, § 7A–289.27. If that answer denies a material allegation, the court must, as has been noted, appoint a lawyer as the child's guardian *ad litem* and must conduct a special hearing to resolve the issues raised by the petition and the answer. § 7A–289.29. If the parent files no answer, "the court shall issue an order terminating all parental and custodial rights; provided the court shall order a hearing on the petition and may examine the petitioner or others on the facts alleged in the petition." § 7A–289.28. Findings of fact are made by a court sitting without a jury and must "be based on clear, cogent, and convincing evidence." § 7A–289.30. Any party may appeal who gives notice of appeal within 10 days after the hearing. § 7A–289.34.FN4

The respondent argues that the subject of a termination hearing-the parent's relationship with her child-far from being abstruse, technical, or unfamiliar, is one as to which the parent must be uniquely well informed and to which the parent must have given prolonged thought. The respondent also contends that a termination hearing is not likely to produce difficult points of evidentiary law, or even of substantive law, since the evidentiary problems peculiar to criminal trials are not present and since the standards for termination are not complicated. In fact, the respondent reports, the North Carolina Departments of Social Services are themselves sometimes represented at termination hearings by social workers instead of by lawyers. FN5

Yet the ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident from the findings some courts have made. See, *e.g. Davis v. Page*, 442 F.Supp. 258, 261 (S.D.Fla.1977); *State v. Jamison*, 251 Or. 114, 117–118, 444 P.2d 15, 17 (1968). Thus, courts have generally held that the State must appoint counsel for indigent parents at termination proceedings. *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980); *Department of Public Welfare v. J.K. B.*, 379 Mass. 1, 393 N.E.2d 406 (1979); *In re Chad S.*, 580 P.2d 983 (Okl.1978); *In re Myricks*, 85 Wash.2d 252, 533 P.2d 841 (1975); *Crist v. Division of Youth and Family Services*, 128 N.J.Super. 402, 320 A.2d 203 (1974); *Danforth v. Maine Dept. of Health and Welfare*, 303 A.2d 794 (Me. 1973); *In re Friesz*, 190 Neb. 347, 208 N.W.2d 259 (1973). FN6 The respondent is able to point to no presently authoritative case, except for the North Carolina

judgment now before us, holding that an indigent parent has no due process right to appointed counsel in termination proceedings.

## C

The dispositive question, which must now be addressed, is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status. To summarize the above discussion of the *Eldridge* factors: the parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed," *Gagnon v. Scarpelli*, 411 U.S., at 788, 93 S.Ct., at 1762, neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in *Gagnon v. Scarpelli*, and leave the decision wheth-

er due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review. See, *e.g.*, *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220.

### III

Here, as in *Scarpelli*, "[i]t is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements," since here, as in that case, "[t]he facts and circumstances are susceptible of almost infinite variation" 411 U.S., at 790, 93 S.Ct., at 1764. Nevertheless, because child-custody litigation must be concluded as rapidly as is consistent with fairness, we decide today whether the trial judge denied Ms. Lassiter due process of law when he did not appoint counsel for her.

The respondent represents that the petition to terminate Ms. Lassiter's parental rights contained no allegations of neglect or abuse upon which criminal charges could be based, and hence Ms. Lassiter could not well have argued that she required counsel for that reason. The Department of Social Services was represented at the hearing by counsel, but no expert witnesses testified and the case presented no specially troublesome points of law, either procedural or substantive. While hearsay evidence was no doubt admitted, and while Ms. Lassiter no doubt left incomplete her defense that the Department had not adequately assisted her in rekindling her interest in her son, the weight of the evidence that she had few sparks of such interest was sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference. True, a lawyer might have done more with the argument that William should live with Ms. Lassiter's mother-but that argument was quite explicitly made by both Lassiters, and the evidence that the elder Ms. Lassiter had said she could not handle another child, that the social worker's investigation had led to a similar conclusion, and that the grandmother had displayed scant interest in the child once he had been removed from her daughter's custody was, though controverted, sufficiently substantial that the absence of counsel's guidance on this point did not render the proceedings fundamentally unfair. Finally, a court deciding whether due process requires the appointment of counsel need not ignore a parent's plain demonstration that she is not interested in attending a hearing. Here, the trial court had previously found that Ms. Lassiter had expressly declined to appear at the 1975 child custody hearing, Ms. Lassiter had not even bothered to speak to her retained lawyer after being notified of the termination hearing, and the court specifically found that Ms. Lassiter's failure to make an effort to contest the termination proceeding was without cause. In view of all these circumstances, we hold that the trial court did not err in failing to appoint counsel for Ms. Lassiter.

FN3. Some parents will have an additional interest to protect. Petitions to terminate parental rights are not uncommonly based on alleged criminal activity. Parents so accused may need legal counsel to guide them in understanding the problems such petitions may create.

FN4. The respondent also points out that parental termination hearings commonly occur only after a custody proceeding in which the child has judicially been found to be abused, neglected, or dependent, and that an indigent parent has a right to be represented by appointed counsel at the custody hearing. § 7A–587.

Ms. Lassiter's hearing occurred before some of these provisions were enacted. She did not, for instance, have the benefit of the "clear, cogent, and convincing" evidentiary standard, nor did she have counsel at the hearing in which William was taken from her custody.

FN5. Both the respondent and the Columbia Journal of Law and Social Problems, 4 Colum.J.L. & Soc.Prob. 230

(1968), have conducted surveys purporting to reveal whether the presence of counsel reduces the number of erroneous determinations in parental termination proceedings. Unfortunately, neither survey goes beyond presenting statistics which, standing alone, are unilluminating. The Journal note does, however, report that it questioned the New York Family Court judges who preside over parental termination hearings and found that 72.2% of them agreed that when a parent is unrepresented, it becomes more difficult to conduct a fair hearing (11.1% of the judges disagreed); 66.7% thought it became difficult to develop the facts (22.2% disagreed).

FN6. A number of courts have held that indigent parents have a right to appointed counsel in child dependency or neglect hearings as well. *E. g., Davis v. Page,* 640 F.2d 599 (C.A.5 1981) (en banc); *Cleaver v. Wilcox,* 499 F.2d 940 (C.A.9 1974) (right to be decided case by case); *Smith v. Edmiston,* 431 F.Supp. 941 (W.D.Tenn.1977).

*Lassiter v. Department of Social Services,* 452 U.S. at 26–33, 101 S.Ct. at 2159–63 (some footnotes omitted).

Mother's sole point on appeal is that she was denied her due process right to full representation of counsel. This point is based solely on Mother's allegation that "[b]oth the plain meaning of the term 'consulting,' and the record, particularly the pretrial conference, reflect that consulting counsel had limited powers and duties. For example, consulting counsel lacked the resources to exercise ordinary subpoena powers, let alone seek an expert witness." In support of that allegation, Mother points to the following statements by Consulting Counsel at the November 25, 2005 pre-trial hearing:

[Consulting Counsel]: Practically speaking, Your Honor, this is a motion for permanent custody, and [DHS] doesn't have any information of [Mother's] successful completion of a drug treatment program, and that should raise a red flag to the Court too.... If [DHS is] willing to subpoena someone because—you know, I'd have to get court permission to pay for the subpoena otherwise, and, you know, the state (inaudible) I know it's from different departments but, still ... [.]

....

[Consulting Counsel]: ... We always have to request the Court for subpoena funds, and—to get the sheriff to serve those witnesses that we need. Just as a matter of fees, I was asking [DHS] if they would mind doing it. She—you know, we were still kind of discussing it[.]

Although the family court's November 7, 2003 memorandum supports Mother's assertion "that consulting counsel had limited powers and duties[,]" it does not support Mother's assertion that she was thereby denied her constitutional right to due process. The memorandum supports the contrary assertion that Mother had the benefit of "full representation of counsel" and was not denied her right to due process.

The record does not support Mother's assertions that "consulting counsel lacked the resources to exercise ordinary subpoena powers, let alone seek expert witnesses."

Accordingly, we affirm the January 31, 2006 Order Awarding Permanent Custody and the February 22, 2006 Orders Concerning Child Protective Act.