Associate Chief Justice Lee,
dissenting:
¶45 Parental-rights termination cases are heart-wrenching. They present problems of enormous consequence—of severance of one of the most cherished of all human bonds, with .the safety and welfare of children hanging in the balance. This is a matter on which our sensitivity for justice is heightened. And for that reason I can appreciate a desire to find a way to secure the. appointment of counsel in a case like this one. As a pure policy matter, I see significant upsides in assuring that a parent has the benefit of legal counsel before his legal rights are terminated.
¶46 That said, the issues before us are not policy questions. We are not legislators voting on a statute guaranteeing appointed counsel in parental-termination cases. We are judges faced with questions of law—under our law of preservation, and on matters of statutory and constitutional interpretation. And I find no basis in law for the majority’s conclusions.
¶47 I respectfully dissent. First, I would hold that the father failed to' preserve a claim for a right to counsel under the Due Process Clause and does not qualify under an exception to the rule of preservation. The “exceptional circumstances” exception invoked by the majority is not really a legal exception; it is more of a reservation of this court’s “right” to reach the merits when we want to. We have never articulated concrete standards giving any distinct content to “exceptional circumstances.” That is troubling. We, of course, have the final say and thus the ability to sidestep our own rules and precedents. But the fact that we are a court of last resort does not justify our exercise of power in a black box. We should exercise our discretion in a transparent and consistent manner. I see no way to do so under the “exceptional circumstances” doctrine. I would accordingly repudiate the exception here and going forward, and limit our review of unpreserved errors to those qualifying under the plain error doctrine or on a claim for ineffective assistance of counsel.
¶48 Second, even assuming for the sake of argument that we can excuse the father’s lack of preservation, I would reject his constitutional claim on its merits. The standard set forth in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), prescribes a presumption against appointment of counsel in parental-rights termination cases. The majority turns that presumption on its head. It applies the Lassiter test in a way that virtually guarantees appointment of counsel in most every case in which a parent’s rights are in jeopardy. That may be a good idea as a policy matter, but . it is not required by the Due Process Clause—under either the United States Constitution or the Utah Constitution. I would so hold.
I
¶49 I find no basis for excusing L.E.S.’s failure to preserve a constitutional claim to a right to counsel. He never asserted such a *293 claim in the district court. He never invoked the Due Process Clause as a basis for appointment of counsel, and certainly never asked the district judge to apply the due process balancing test in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).
¶50 The majority agrees. It concedes that L.E.S.’s constitutional claims were not preserved. Yet it still reaches the merits on the basis of so-called “exceptional circumstances.” In so doing the court says that we reserve this exception for “unusual circumstances” in which “our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice.” Supra ¶19 (quoting Jacob v. Bezzant, 2009 UT 37, ¶ 34, 212 P.3d 535). And it cites “unusual procedural circumstances in this case” that purportedly qualify L.E.S. for the exception. Supra ¶20.
¶51 I respectfully dissent. On reflection[1] I have come to the conclusion that the “exceptional circumstances” doctrine should be repudiated. Our court has invoked this “exception” on a number of occasions over the years. Yet we have never really given it any distinct content. In fact we seem to have gone out of our way to do the opposite. We have spoken of the exceptional circumstances exception as “ill-defined,” State v. Holgate, 2000 UT 74, ¶ 12, 10 P.3d 346, and our court of appeals has referred to it as a doctrine that is not “precise” and cannot “be analyzed in terms of fixed elements,” State v. Irwin, 924 P.2d 5, 8 (Utah Ct. App. 1996).
¶52 The majority follows a similar course in this ease. Instead of defining the content of the doctrine, the court continues the practice of speaking in generalities. It concludes only that this is a “narrow exception” reserved for “unusual procedural circumstances,” and proeeéds to list the circumstances in this case that strike the court as noteworthy. Supra ¶20. That is doctrinally circular. If we are unwilling or unable to define the content of the exceptional circumstances doctrine, then we don’t really have a doctrine; we have a reservation of our “right” to ignore a preservation problem when we find it expedient.
¶53 That strikes me as unacceptable. This is a court of law. We owe it to both the parties and the lower courts to operate in accordance with a transparent set of legal principles. Such principles assure the opportunity for evaluation of our decisions. They minimize the risk of arbitrary decision making.’ And they facilitate reliance on our case-law.
¶54 We undermine all of the above when we hide, our analysis in the confines of a black box. That is the effect, in my view, of the “exceptional circumstances” doctrine applied today. Through the high-sounding rhetoric of “manifest injustice” and “rare procedural anomalies,” supra ¶19, we create the appearance of a legal standard. But because we are unwilling to prescribe actual elements or standards for this doctrine, we are really just reserving an unchecked right to reach the merits when we want to.[2]
¶55 The majority identifies “circumstances” that it deems “exceptional.” It notes that the district judge “initially granted” L.E.S.’s request for appointed counsel before *294 he switched course. Supra ¶20. And it concludes that that appointment left L.E.S. “unrepresented” and unable “to make a sophisticated constitutional argument for the right to counsel.” Supra ¶20. With this in mind, the court purports to state a general holding: “When a party is appointed counsel who refuses to make an argument for the right to counsel when that right is challenged, and the party is barred from making that argument, and the party then is denied counsel and subsequently would have to make a sophisticated constitutional argument for the right to counsel with no technical vehicle for making such an argument, exceptional circumstances are met.” Supra ¶21. But that is not the statement of a general rule. It is a summary of the facts of this case, followed by a conclusion that we prefer to reach the merits.[3]
¶56 The court’s summary of the circumstances of the case, moreover, make this one seem rather ^exceptional. First, I cannot see how the initial appointment of counsel can make any difference. The appointment, granted, made it initially more difficult for L.E.S. to advance his constitutional claim as a pro se party—given that counsel failed to respond to the county attorney’s motion asking the court to retract the earlier appointment. See supra ¶20 (asserting that “L.E.S. had no right to oppose the motion himself” while he was represented by counsel). But there is no reason to suspect that the initial appointment in any way inhibited L.E.S. from making a constitutional claim.[4] From all *295 that appears, neither L.E.S. nor his lawyer thought to make the argument. And in any event there is no doubt that L.E.S. had the chance to raise a constitutional claim in subsequent proceedings when he was no longer represented by counsel. Again he just failed to do so.
¶57 That is why, presumably, the court falls back on the notion that the Lassiter framework involves a “sophisticated constitutional argument.” Supra ¶20. Pair enough. But the argument under Lassiter is no more complex or “sophisticated” than any of a wide range of constitutional claims we have long deemed subject to the law of preservation. And presumably the court is not adopting a general exception to the law of preservation for pro se parties advancing “sophisticated” constitutional claims.[5] It is only asserting that “these circumstances” are sufficient. Supra ¶21. But that strikes me as inadequate. If we are unwilling to articulate a general rule, we leave the impression that we are acting lawlessly. And in the absence of any such rule here, I dissent from the invocation of the exceptional circumstances doctrine. Finding nothing in our caselaw to define the contours of any such rule, moreover, I would repudiate this doctrine going forward.
¶58 I see no real barrier in our cases'to so doing. We have adverted to an “exceptional circumstances” basis for an exception to the law of preservation in a string of past eases. But we have rarely invoked it in a case in which it made any difference. In most cases where we have articulated this exception, in other words, we have either declined to apply it[6] or proceeded to identify an alternative basis for appellate review (either a determination that the matter was preserved or that review is necessary under the doctrine of plain error).[7]
*296 ¶59 In these circumstances I see no stars decisis reason to retain the doctrine of exceptional circumstances. That follows from the fact that the doctrine has rarely taken hold as a firm holding of the court, see State v. Gardiner, 814 P.2d 568, 572 (Utah 1991) (noting that “this court is not bound by earlier dicta”), and from the unpredictability and unworkability of the doctrine, see Eldridge v. Johndrow, 2015 UT 21, ¶ 40, 345 P.3d 553 (noting that “to determine whether a precedent has become firmly established,” the court first asks “how well it has worked in practice”). Thus, I would observe the general rule of preservation in this ease and limit exceptions to those more firmly rooted in our caselaw (plain error review and claims rooted in ineffective assistance of counsel),
¶60 And I would affirm on that basis. L.E.S. cannot possibly establish plain error. The Lassiter balancing test, as noted below, is highly fact-intensive and case-specific. It can hardly be plain or obvious that counsel should have been appointed under the Lassi-ter standard, particularly where this court is divided on that same question. This is not an appropriate case for an ineffective assistance of counsel claim, moreover. Under established caselaw, such a claim is limited to the criminal realm, in which a party has a Sixth Amendment right to counsel,[8] This is not such a case, and L.E.S. has no basis for avoiding the law of preservation by advancing a claim for ineffective assistance.
II
¶61 Even accepting the majority’s “exceptional circumstances” analysis for the sake of argument, I still would affirm. I would do so under the Due Process Clause of the United States Constitution under the standard set forth in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), which articulates a presumption against the mandatory appointment of counsel in a parental-rights termination case. I dissent from the majority’s analysis because it seems to me to turn this presumption on its head. This is a simple, straightforward parental-rights termination case, and I would deem it subject to the presumption against the appointment of counsel set forth in Lassiter,
¶62^1^ conclusion requires me to reach a question not addressed by the majority— whether L.E.S. has a right to appointed counsel under the Due Process Clause of the Utah Constitution, Utah Const, art. I, § 7, To decide that question I would begin with first principles—with the text of the Utah Constitution as understood at the time of its framing. And I would hold that L.E.S. has no right to appointed counsel as a matter of Utah constitutional law because such right would not have been recognized as a component of “due process” in 1896.
A
¶63 The controlling due process framework under the United States Constitution is that set forth in the Lassiter case. In Lassiter, the court reiterated a longstanding “presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.”[9] 452 U.S. at 27, 101 S.Ct. 2153. Yet it *297 also left room for an exception to this general rule. It held that the factors in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)—“the private interests at *298 stake, the government’s interest, and the risk that the procedures used will lead to erroneous decisions”—may weigh “against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.” Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.
¶64 The Lassiter opinion assessed the relevant Eldridge factors as follows: “[T]he parent’s interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent’s rights insupportably high.” Id. at 31, 101 S.Ct. 2153. Lassiter then set forth the following standard for rebuttal of the above-stated presumption:
If, in a given case, the parent’s interests were at their strongest, the State’s interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the Eldridge factors will not always be so distributed, and since “due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,” neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in Gagnon v. Scarpelli, and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review.
Id. at 31-32, 101 S.Ct. 2153 (citations omitted).
¶65 The Lassiter court applied this standard in a case involving an incarcerated parent whose rights were severed on the basis of her failure to “maintain concern or responsibility for the welfare” of her child, and the determination that termination was in the “best interests of the minor.” Id. at 24, 101 S.Ct. 2153. In rejecting Ms. Lassiter’s assert ed right to appointment of counsel, the court focused on the nature of the issues in the case and the perceived need for counsel to address them. It noted that there were “no allegations of neglect or- abuse upon which criminal charges could be based,” id. at 32, 101 S.Ct. 2153; it observed that “no expert witnesses testified and the ease presented no specially troublesome points of law, either procedural or substantive,” id.; and it concluded that “the weight of the evidence” was “sufficiently great that the presence of counsel for Ms. Lassiter could not have made a detex-minative difference” in the case, id. at 32-33, 101 S.Ct. 2153.
¶66 I view the Lassiter opinion as highlighting the importance of the third Eldridge factor—the “risk that the pi-ocedures used will lead to erroneous decisions.” Id. at 27, 101 S.Ct. 2153. It does so in several ways. First is the court’s reiteration of the presumption against the appointment of counsel (in a case in which inearcei’ation is not a risk). The presumption is a core premise of the court’s opinion. See id. at 26-27, 101 S.Ct. 2153 (“[T]he presumption [is] that an indigent litigant has a light to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due pi'ocess decision must be measured.”); id. at 27, 101 S.Ct. 2153 (the court “must balance [the Eldridge] elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal fi-eedom”); id. at 31, 101 S.Ct. 2153 (“[t]he dispositive question ... is whether the three Eldridge factoi-s, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption....”). And the presumption must be understood in light of the *299 nature of the three factors from Eldridge: For the most part, the private interests and the State’s interests are static, so the factor that varies most from case to ease is the third—the risk of error in a proceeding in which the parent proceeds without appointed counsel.
¶67 The court’s opinion underscores that point in the way it describes the three El-dridge factors. The discussion of the first two factors is relatively short and straightforward. And the court’s description of these factors is mostly static. The court speaks in terms of the State’s interests as they will stand in most all cases—in assuring the “welfare of the child,” in securing “an accurate and just decision,” and in seeing that the “termination decision [is] made as economically as possible.” Id. at 27-28, 101 S.Ct. 2153. The description of the “private” interests of the indigent parent is similarly static. Of that factor, the court highlights the “commanding” nature of the “parent’s interest in the accuracy and justice of the decision to terminate his or her parental status,” noting that this interest may be enhanced in a case involving a risk of criminal jeopardy. Id. at 27, 101 S.Ct. 2153.
¶68 The court’s discussion of the third factor—the risk of error—is different. Here the analysis is decidedly dynamic and clearly ease-dependent. The court observes (citing the State’s arguments) that the “subject of a termination heating”—“the parent’s relationship with her child”—may be “one as to which the parent must be uniquely well informed and to which the parent must have given prolonged thought.” Id. at 29, 101 S.Ct. 2153. It also states (again citing the State’s arguments) that some termination proceedings are “not likely to produce difficult points of evidentiary law, or even of substantive law, since the evidentiary problems peculiar to criminal trials are not present and since the standards for termination are not complicated.” Id. On the other hand, the court notes that “the ultimate issues with which a termination hearing deals are not always simple,” offering the example of a case' in which “[e]xpert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented.” Id. at 30, 101 S.Ct. 2153.
¶69 Finally, the court’s application of these standards to the relevant facts in Lassiter underscores the crucial role of the third factor. In concluding that Ms. Lassiter was not entitled to appointed counsel, the Lassiter court cites circumstances rooted extensively in the risk of error analysis—the lack of expert testimony or “troublesome points of law, either procedural or substantive,” and the notion that the evidence was sufficiently strong that a lawyer would not likely have made a difference. See id. at 32-33, 101 S.Ct. 2153.
¶70 For these reasons it seems to me that the Lassiter standard is highly dependent on the third Eldridge factor.[10] Fidelity to the Lassiter presumption, and to the above-stated standards, requires us to find a due process right to counsel only in the unusual parental-rights termination case—only in the case (unlike Lassiter or this case) in which there are complex legal or evidentiary questions requiring an unusual degree of legal expertise.[11] The calculus may change where *300 there is a risk of criminal jeopardy that supplements the parent’s interest; but no such risk is present here.[12]
¶711 would affirm because I find no such a basis for appointment of counsel here. From all that appears from the record, this is a garden-variety parental termination case in which the key issue concerns the “the parent’s relationship with her child”[13]—a matter on which the parent is “uniquely well informed and to which the parent must have given prolonged thought.” Id. at 29, 101 S.Ct. 2153. L.E.S. has identified no “troublesome points of law,” no difficult evidentiary issues, and no expert testimony that he was required to address. Nor has he identified any evidence he would have presented—or opposing evidence he would have rebutted more effectively—if he had been appointed a lawyer. And these failures are fatal.[14] Absent any arguments along these lines, I see no basis for a rebuttal of the presumption in Lassiter.
¶72 The majority opinion acknowledges the Lassiter presumption. Supra ¶22. And it cites no significant legal or evidentiary complexities of this case—no expert testimony at issue and no difficult question of legal analysis—that heightened the risk of error. Indeed the court concedes that there was “no expert medical or psychiatric testimony or other similarly complicated evidence [ ] brought before the court” and acknowledges “the apparent simplicity of the record.” Supra ¶34. Yet the court nonetheless speculates that “it is possible” that such complications could be introduced into the case—that if L.E.S. had “been represented by counsel, such [expert] testimony may have been brought” and the “simple and uncomplicated” case presented could well have been less so. Supra ¶34. Thus, the court says that “the apparent simplicity of the record may be due to the fact that L.E.S. represented himself pro se and had no opportunity to present more complicated evidence and argument with the aid of counsel.” Supra ¶34. On that *301 basis, the majority “conclude^] that the risks of error in this case were significant,” and sufficient to rebut the presumption against appointment of counsel. Supra ¶34.
¶73 This analysis is unfaithful to Lassiter. By engaging a counterfaetual hypothetical instead of analysis of the actual case presented, the court effectively inverts the Lassiter presumption. If the hypothetical possibility that a lawyer could transform a straightforward case into a complicated one is enough, then most any indigent parent will be enti-tied to counsel. That can most always be said.[15] In future cases, a Utah parent seeking appointed counsel will not bear the burden set forth in Lassiter; he need only cite paragraph 33 of today’s opinion—noting the hypothetical possibility that a lawyer could turn a-“simple and uncomplicated” case into a complex one, and concluding that that renders the risk of error “significant” enough to justify counsel’s appointment.[16] And if that is enough—as it apparently is under today’s majority opinion—then we have flipped the Lassiter presumption.[17]
*302 ¶74 Fidelity to Lassiter demands that we affirm the district court’s decision not to appoint counsel for L.E.S. The majority’s analysis of the significance of the parent’s interest in maintaining a relationship with his child, supra ¶¶25-26, and the State’s interests (a weak pecuniary interest in opposing appointment, and a shared interest in protecting the child and assuring a just outcome), supra ¶¶27-28, is insufficient. These points are broadly applicable premises that will hold in most any case. And such considerations cannot suffice to rebut the Lassiter presumption unless we are effectively inverting it.
¶75 The court claims to find two unique features of this case in its analysis of the “private interest” and “government interest” factors. On the former the majority speculates that there may be “some concern regarding the risk of self-incrimination in this ease” given that “the district court found that L.E.S. should have taken K.AS.’s mother to court for refusing to facilitate visits but that he did not do so because ‘he was afraid because he was on drugs,’ ” and “the district court also noted that L.E.S.’s ‘extensive substance abuse is terms of neglect.’” Supra ¶26. But this is a concern of the court’s own imagining. L.E.S. failed to raise it in his briefs on this appeal, and the adoptive parents have therefore not been heard on the matter. And in any event a vague allusion to past drug use does not prove that there was a tangible risk of self-incrimination. I would not so conclude here—certainly not without adversary briefing on the matter.
¶76 As to the second Eldridge factor, the court asserts that “the State’s interest in terminating L.E.S.’s parental rights was ... less urgent in this case than it was in Lassi-ter[ ] because this parental-rights termination proceeding was initiated and advanced by a private party rather than by the State.” Supra ¶28. But I do not see how that follows. Any and all termination proceedings implicate the State’s power and the State’s interest in protecting the safety and welfare of the child. See supra ¶28 (acknowledging that “the State is necessarily involved in the termination of parental rights since only the State can terminate a parent’s rights to his or her child”). I see nothing in the record or in our law to support the court’s premise that the State’s interest is diminished in a case initiated by a private party. Certainly the interests of the child are the same regardless of who initiates the case. And the parent’s interests are likewise unaltered. Where our law authorizes private parties to sue to initiate a parental-rights termination case, we should presume that such a case is advancing governmental policy.
¶77 Finally, on the third factor, the court claims that the risk of error is more significant in a proceeding initiated by a private party because “L.E.S. has not enjoyed the additional protections provided in state-initiated termination cases.” Supra ¶31. But this is the wrong baseline. Under Lassiter the question is not whether we can identify other cases in which the risk of error is diminished (due to “additional protections” afforded by statute or otherwise). It is whether the risk of error is unreasonably “significant” as that inquiry is framed in the Lassiter opinion.
¶78 The Lassiter court framed the inquiry by reference to North Carolina procedures available to the parent in that case. Lassiter, 452 U.S. at 28-29, 101 S.Ct. 2153 (describing the procedures North Carolina established to “assure accurate decisions” in termination proceedings). And it found the risk of error insufficient to sustain the conclusion that counsel was necessary as a matter of due process. Id. at 32-33, 101 S.Ct. 2153. That should be dispositive here. L.E.S. faced no greater risk than that faced by the parent in Lassiter. The Utah procedures afforded to L.E.S. are parallel to those available under North Carolina law in Lassiter. Compare Lassiter, 452 U.S. at 28-29, 101 S.Ct. 2153, with Utah Code §§ 78A-6-503 to -507. And, as stated above, L.E.S. has identified no “troublesome points of law,” no difficult evi-dentiary issues, and no expert testimony that he was required to address.
*303 ¶79 For these reasons I view the Lassiter presumption as controlling here. I see no basis for a rebuttal of that presumption in this ease. And I dissent from the majority’s contrary conclusion, which seems to me to invert the presumption announced by the court.
B
¶80 The controlling due process framework under the Utah Constitution has not been established in our caselaw.[18] To resolve L.E.S.’s state constitutional claim, I would accordingly begin with first principles—with the text of the Utah Due Process Clause, and with the meaning of those terms at the time of the framing of our Utah Constitution.[19] I would examine the “plain meaning” of the text of the Utah Constitution in light of “historic experience” and the “presuppositions of those who employed them,” keeping in mind “Utah’s particular traditions at the time of drafting.” American Bush v. City of S. Salt Lake, 2006 UT 40, ¶¶ 10, 12, 140 P.3d 1235.
¶81 L.E.S. purports to advance an originalist basis for his state due process claim. He cites late nineteenth-century history in support of the notion that our Utah founders valued parenthood and family unity highly, so much so that they embraced a religious belief that family bonds continue beyond this world. L.E.S. notes, in particular, the history of anti-polygamy raids in Utah, emphasizing the length to which our Utah founders went to protect their legal relationships with their children, and positing that they would have found parental-rights termination proceedings problematic. From that premise, L.E.S. posits that the framers of the Utah Constitution would have been in favor of appointment of counsel in a parental-rights termination proceeding. And he urges us to read one into the Utah Due Process Clause on this basis.
¶82 The cited history is interesting. And a party should always be commended for seeking to tie his constitutional analysis to the original meaning of the text.[20] Here, however, L.E.S.’s history falls short because it is at far too high a level of generality. L.E.S. hasn’t presented anything of relevance to the founding-era meaning of “due process.” He has simply asserted that families were important to the generation that framed the Utah *304 Constitution. That is undoubtedly trae. But it tells us little or nothing about how far they were inclined to go in protecting families ties, and even less about whether they thought their inclinations were enshrined in the constitutional guarantee of “due process.”
¶83 To answer that question, we must look to the historical understanding of the principle of due process. And we must ask whether that principle encompasses a right to a lawyer appointed and paid for by the State. The answer to that question is no. I would reject L.E.S.’s state constitutional claim because it finds no support in the 1890s-era understanding of “due process” and because it is undermined by the proceedings of the Utah constitutional convention.
1
¶84 Historically, the guarantee of “due process of law” was understood as a legal term of art encompassing long-established principles associated with “the law of the land.” Edward Coke, The Second Part Op The Institutions op the Laws op England 46, 50 (3d ed. 1669). This is the understanding of “due process” that prevailed in the U.S. Supreme Court throughout the nineteenth century. A classic statement is set forth in Murray v. Hoboken Land & Imp. Co., 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1866): “The words, ‘due process of law,’ were undoubtedly intended to convey the same meaning as the words, ‘by the law of the land,’ in Magna Charta." Id. at 276 (citation omitted).[21]
¶86 The “law of the land” was widely understood to encompass three basic guarantees: “(1) it rendered the King’s power subject to ‘law’; (2) it guaranteed the barons a right to participate in decisions which affected them; and (3) it assured equal treatment” under law.[22] Thus, the guarantee of “due process” served as “a restraint on the legislative as well as on the executive and judicial powers of the government.” Murray, 59 U.S. at 276. But the restraint on legislative power operated to prevent rather than require deviations from traditional notions of due process.
¶86 In Murray, the United States Supreme Court laid out a historical test for determining whether a certain procedure satisfied “due process of law.” Id. at 277. First, the court should “examine the constitution itself’ and see if the procedure directly conflicts with any of its provisions. Id, If not, the court should then “look to those settled usages and modes of proceeding existing in the common and statute law of England” as well as “the legislation of the colonies and provinces, and more especially of the States.” Id. at 277-78. If a procedure was consistent with the practice of the common law and with “the laws of many of the [sjtates at the time of the adoption of this amendment” then it “cannot be denied to be due process of law.” Id. at 280.
¶87 In later cases, the United States Supreme Court elaborated upon this tést, It explained that while a historical pedigree was sufficient condition for the “due process of law,” the Constitution did not forbid innovative procedures that were not rooted in the common law tradition. The court noted that that would “deny every quality of the law but its age, and ... render it incapable of progress or improvement.” Hurtado v. California, 110 U.S. 516, 529, 4 S.Ct. 292, 28 L.Ed. 232 (1884). Yet the court continued to reiterate that a practice rooted in historical tradition would survive due process scrutiny. It held that “any legal proceeding enforced by public authority ... which regards and preserves these principles of liberty and justice, must be held to be due process of law.” Id. at 537, 4 S.Ct. 292. And it noted that the Due Process Clause thus “refers to certain fundamental rights which [our] system of jurisprudence ... has always recognized.” Id. at 536, 4 S.Ct. 292 (citing Brown v. Bd. of Levee Comm’rs, 50 Miss. 468, 480 (1874) (emphasizing the requirements of jurisdiction, notice, *305 and process as integral to due process of law)).
¶88 The United States Supreme Court identified certain “principles of liberty and justice” that are integral to due process and are generally guaranteed as tenets of due process: “regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings.” Murray, 59 U.S. at 280; see also Wilkinson v. Leland, 27 U.S. (2 Pet.) 627, 657, 7 L.Ed. 542 (1829) (forbidding the exercise of eminent domain power “without trial, without notice, and without offence”). With the exception of certain summary procedures where these demands may not apply, such guarantees form the core protections of the Due Process Clause. See Murray, 59 U.S. at 280.
¶89 State due process provisions were interpreted in a similar fashion. In decisions throughout the eighteenth and nineteenth centuries, state supreme courts interpreted their state due process clauses to preserve a similar set of principles. The Tennessee Supreme Court, for example, interpreted that state’s due process provision as a guarantee that all laws were “equally binding upon every member of the community,” and not just available to certain favored groups. Sheppard v. Johnson, 21 Tenn. 285, 296 (1841); see also State v. Stimpson, 78 Vt. 124, 62 A. 14, 18 (1905); Eden v. People, 161 Ill. 296,43 N.E. 1108, 1109 (1896). Other state supreme courts likewise embraced such a “law of the land” notion of due process.[23] In other states, the courts extended the due process principle to protect against the infringement of certain fundamental tenets of due process, such as the right to a trial, Zylstra v. Corp. of Charleston, I S.C.L. (I Bay) 382 (1794), and a nonarbitrary procedure of adjudication under their state due process clauses, Vanzant v. Waddel, 10 Tenn. 260 1829.
¶90 Thus, the prevailing understanding of the Due Process Clause through the eighteenth and nineteenth centuries can generally be summarized as follows: Procedures which were consistent with the common law arid historical tradition were presumptively permissible, while new procedures were permissible so long as they did not deny one of the core protections of due process, such as a right to notice and a meaningful opportunity to be heard.[24]
2
¶91 The historical understanding of “due process”—the view that prevailed at the time of the framing of the Utah Constitution— cannot be deemed to encompass a right to a lawyer paid for by the government. Nor can this principle be understood to yield to courts the power to prescribe evolving standards of constitutional “fairness” based on an assessment of the costs and benefits of innovations in procedure.
¶92 We possess the power to assure fair procedure—and to do so by weighing costs and benefits. “But our usual course for so doing is by promulgating rules of procedure.” In re Steffensen, 2016 UT 18, ¶ 7, 373 P.3d 186. Thus, the Due Process Clause does not impose upon us “a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall.” Id. ¶ 7 n.2 (quoting Ownbey *306 v. Morgan, 256 U.S. 94, 110-11, 41 S.Ct. 433, 65 L.Ed. 837 (1921)). “[T]he Due Process Clause is not a freewheeling constitutional license for courts to assure fairness on a case-by-case basis.” Id. ¶ 7. It is a historically driven test “measured by reference to ‘traditional notions of fair play and substantial justice”’ Id. (citing ClearOne v. Revolabs, 2016 UT 16, ¶ 8, 369 P.3d 1269).
¶93 I would interpret the Utah Due Process Clause in accordance with the historical understanding set forth above. And I would accordingly reject L.E.S.’s claim to a constitutional right to appointed counsel.
¶94 L.E.S. has identified no historical basis for a due process right to a lawyer paid for by the state. The procedures afforded him accord with historical due process: He was given notice and a meaningful opportunity to be heard, and the procedures available to him were in line with those secured historically. Because L.E.S. is seeking a novel advancement in procedure, his recourse is elsewhere—in a proposal for legislative reform, for example—and not in a state constitutional claim.
¶95 I am aware of no historical evidence supporting the right to paid counsel. At the time of our Utah founding, a number of states had begun to provide for appointment of counsel in criminal cases.[25] But none extended this right beyond the criminal context.[26] And in the criminal realm, the right secured by the states was a legislative innovation, not a judicial one. And no one thought that such a right was inherent in the constitutional guarantee of due process.[27]
¶96 This held in Utah around the time of our founding. Our 1898 code provided for appointed counsel for indigent defendants in criminal cases, see Utah Revised Statutory Code of 1898, § 4767, but nowhere in our law was there a right to appointed counsel in a civil setting. And of course there was no indication in the early years of our state that anyone thought that “due process” guaranteed a lawyer paid for by the state (in a criminal case or otherwise).
¶97 The debates in our Utah constitutional convention support this conclusion. A relevant part of the debate took place on March 23, 1898. On that date, the question arose as to whether the article 1 section 12 right not to be “compelled to advance money or fees to secure the rights herein guaranteed” also guaranteed a right to paid counsel. 1 Proceedings in the Constitutional Convention of 1898, at 308 (proceeding of March 23, 1898). Mr. Eldredge asked Mr. Evans (of Weber) what would happen to the “the poor fellow that has no money.” Id. Evans responded that “[t]hat is usually provided by the legislature” and that “[i]t is a very unusual thing in constitutions, but a very usual thing in the statutory laws.” Id. That is significant. And no one raised a parallel question regarding the article 1 section 11 right in “any civil cause to which he is a party” to “prosecut[e] or defend[ ] before any tribunal in this State, by himself or counsel.” See Utah Const. of 1896 art. I, § 11.
¶98 For these reasons, I see no basis for finding a state constitutional right to appoint ed counsel in a case like this one. Due process is not a charter for “free-wheeling authority for the courts to second-guess the wisdom or fairness of legislative policy judgments.” In re Adoption of B.Y., 2015 UT 67, ¶ 27, 356 P.3d 1215 (citation omitted). It is an assurance of a right to traditional, longstanding tenets of due process, such as a “reasonable notiee and an opportunity to be heard.” *307 Id. ¶ 16. I would reject L.E.S.’s claim because he cites no such basis for a right to appointed counsel.
Ill
¶99 When a novel question of constitutional law presents itself, it is tempting to treat the question as an invitation to vindicate our gut-level sense of “justice,” or in other words our sense of good policy. That temptation is heightened when the matter at hand is as sensitive and difficult as the one at issue here—of appointment of counsel in a parental-rights termination case. I can understand the impulse to find a basis for such an appointment. But I find no such basis in constitutional law. And in the absence of such a basis, I would leave the matter to the legislature.
¶100 That is the branch of government with the power and experience necessary to decide on the wisdom of allocating public money to support appointment of counsel. And it is the branch of government that has direct accountability to the people. Perhaps in time the legislature will decide that paid counsel should be appointed in a case like this one. Unless and until that happens, I would not find a legal right to appointed counsel in parental-termination eases.

. When we issued a supplemental briefing order at an earlier stage of this case, we indicated that we had "unanimously" concluded that L.E.S. qualified for an exception to the rule of preservation. Supplemental Briefing Order (September 21, 2015). That was true at the time we issued the order. But I have since come to see the matter differently. Perhaps that makes me a flip-flopper. I prefer to see it as wisdom coming late—and better than not at all. See Arthur Conan Doyle, The Man with the Twisted Lip, in The Adventures Of Sherlock Holmes 101 (Sam Vaseghi ed., Wise-house Classics 2016) (1892) ("'It has been in some points a singular case,’ said Holmes, flicking the horse on into a gallop. 'I confess that I have been as blind as a mole, but it is better to learn wisdom late than never to learn it at all.' ”). In all events I will say, as have many judges on many occasions, that the matter "does not appear to me now as it appears' to have appeared to me then.” Andrews v. Styrap, 26 L.T.R. (N.S.) 704, 706 (Ex. 1872) (Bramwell, B.).

. See Tory A. Weigand, Raise or Lose: Appellate Discretion and Principled Decision-Making, 17 Suffolk J. Trial & App. Advoc. 179, 181 (2012) (noting that application of an exceptional circumstances exception can lead to "loss of clarity and consistency" due to "the lack of uniform criteria or identifiable scale as to individual or cumulative weight to be given to the multi-factor strain of the discretionary exception”).

. The majority seeks to limit the exception that it adopts today by asserting that L.E.S.'s lawyer "abdicated all responsibility by failing to make any argument regarding L.E.S.’s right to representation.” Supra ¶21 n.3. But despite the rhetorical flourish, the majority's ultimate conclusion boils down to a failure of preservation on the issue raised on appeal. The "abdication] of all responsibility” is purely in the failure to raise an issue that the client wishes to raise on appeal. That problem falls in the heartland of the law of preservation. And the usual (and in my view appropriate) response to a failure to preserve is not to excuse it on the ground that it amounts to abdication, but to deem it insufficient as a matter of preservation.

. If L.E.S. had actually been precluded from preserving his constitutional claim, then we could excuse his lack of preservation. We would do so, however, not under a loose exception to the law of preservation, but under one of its core tenets. The rule of preservation incorporates a principle of reasonableness. A party has a duly to take reasonable efforts to give the district court a chance to correct errors he wishes to raise on appeal. State v. Pinder, 2005 UT 15, ¶ 46, 114 P.3d 551; Patterson v. Patterson, 2011 UT 68, ¶ 12, 266 P.3d 828. That principle incorporates a concept of impossibility and a doctrine of futility: A party who cannot legally or practically object is not required to do so, and our courts accordingly excuse a failure to object where doing so would be futile. State v. Rothlisberger, 2004 UT App 226, ¶ 29, 95 P.3d 1193. Yet L.E.S. comes nowhere close to qualifying under these standards. He had every reason and opportunity to preserve his due process claim; he just didn't think to raise it.
The majority bases its determination of "exceptional circumstances” on the fact that "L.E.S. had no technical vehicle” for raising the Lassiter issue because he had already been denied appointed counsel and "[m]otions to reconsider are not recognized by the Utah Rules of Civil Procedure.” Supra ¶20 (quoting Tschaggeny v. Milbank Ins. Co., 2007 UT 37, ¶ 15, 163 P.3d 615). But that analysis ignores the agency relationship between a party and his lawyer. "For better or worse, our legal system treats attorneys as agents for their clients. And on that basis we generally deem clients responsible for the decisions they make on advice of counsel.” In re Adoption of J.S., 2014 UT 51, ¶ 63, 358 P.3d 1009 cert. denied sub nom. Bolden v. Doe, - U.S. -, 136 S.Ct. 31, 193 L.Ed.2d 24 (2015). Thus, L.E.S. did have an opportunity to raise a due process right to appointed counsel. The opportunity came to him at a time when he was represented by counsel. And counsel's failure to raise the argument is imputed to L.E.S. He cannot avoid the effect of his lawyer's failure to preserve an issue at trial by identifying a new issue that he was "unable” to raise because his lawyer failed to do so.
The majority's contrary conclusion threatens to swallow the law of preservation. If a party can avoid the effects of a failure of preservation by retaining new counsel on appeal and blaming the lack of preservation on prior counsel, I suspect we will see a lot of new lawyers retained on appeal. Perhaps that will be a boon to appellate specialists. But it will undermine the fairness, efficiency, and reliance concerns protected by our law of preservation. The majority's standard cannot stand. In time we will inevitably be forced to retract it. I would avoid that eventuality by rejecting the majority's approach here.
The majority alludes to unspecified deficiencies in a malpractice claim in these circumstances. Supra ¶21 n.3. It is undoubtedly true that a malpractice action would not provide an avenue for L.E.S. to restore his parental rights. But our law of preservation has never recognized an exception along these lines—an exception measured by the adequacy of the remedy in a malpractice suit. And this strikes me as an imprudent step—and one we will be required to limit in future cases.

. Pro se litigants generally are held "to the same standard of knowledge and practice as any qualified member of the bar.” State v. Winfield, 2006 UT 4, ¶ 19, 128 P.3d 1171 (citation omitted). Thus, we "accord[] every consideration that may reasonably be indulged” from the arguments that a pro se litigant makes, id. but we do not excuse such a party from the rules of preservation. Cf. id. ¶¶ 20-21 (finding invited error and refusing to consider arguments raised on appeal). A contrary rule would create chaos in our appellate system. And I assume the majority is not abandoning this principle. But that only underscores the loose, fact-driven nature of the majority’s decision.

. See, e.g., State v. Munguia, 2011 UT 5, ¶¶ 24-29, 253 P.3d 1082 (concluding that the "exceptional circumstances” exception was not implicated by the facts of the case); State v. Nelson-Waggoner, 2004 UT 29, ¶¶ 15-16, 23-24, 94 P.3d 186 (same); In re Schwenke, 2004 UT 17, ¶ 34 & n.6, 89 P.3d 117 (same); State v. Lopez, 886 P.2d 1105, 1113 (Utah 1994) (same); Jolivet v. Cook, 784 P.2d 1148, 1151 (Utah 1989) (same); State v. Steggell, 660 P.2d 252, 254 (Utah 1983) (explaining that “[i]n the absence of exceptional circumstances, this [cjourt has long refused to review matters raised for the first time on appeal,” and concluding that "[njo exceptional circumstances exist in the present case”); State v. Pierce, 655 P.2d 676, 677 (Utah 1982) (declining to address unpreserved constitutional issue under the exceptional circumstances exception).

. See, e.g., State v. Low, 2008 UT 58, ¶¶ 19-49, 192 P.3d 867 (suggesting that “exceptional circumstances” was an established doctrine, but ultimately applying "plain error”); State v. Dunn, 850 P.2d 1201, 1209 n.3 (Utah 1993) (recognizing the existence of the "exceptional circumstances” doctrine, but noting that the exception was "ill-defined and applies primarily to rare procedural anomalies,” and choosing to "proceed under the better-established plain error exception” (citations omitted)).
Judge Roth of our court of appeals has suggested that the "most prominent cases where Utah courts have found exceptional circumstances and reviewed unpreserved issues are ‘where a change in law or the settled interpretation of law colorfe] the failure to have raised an issue at trial.’ ” State v. Johnson, 2014 UT App 161, ¶ 34, 330 P.3d 743 (Roth, J., concurring) (alteration in original) (citing State v. Lopez, 873 P.2d 1127, 1134 n.2 (Utah 1994); see also State v. Haston, 846 P.2d 1276 (Utah 1993) (per cu-riam)). This may be a wise limitation. But we have never clearly articulated it—and certainly have never limited the exceptional circumstances doctrine to these circumstances. See Lopez, 873 P.2d at 1134 n.2 (allowing "independent analysis” on state constitutional standard without deciding whether the issue was adequately preserved; concluding that such briefing was permitted because changes in federal constitutional law explained why the state issue may not have been raised below; but failing to give any content to the exceptional circumstances doctrine); Haston, 846 P.2d at 1277 (allowing appellant to assert that his conviction was "for a crime which is not recognized in Utah”; but without mentioning "exceptional circumstances,” much less defining it; and concluding that a denial of a right to raise this argument "would deny [the] defendant due process, as guaranteed under our federal and state constitutions”). Ultimately, moreover, a barrier to raising an issue in the district court might well fit *296 within the existing law of preservation (and not need an exception), given that our law requires only reasonable efforts to preserve an issue, at trial. See supra ¶56 n.4.

. See Nelson v. Boeing Co., 446 F.3d 1118, 1119 (10th Cir. 2006) ("The general rule in civil cases is that the ineffective assistance of counsel is not a basis for appeal or retrial. If a client’s chosen counsel perforins below professionally acceptable standards ... the client’s remedy is not reversal, but rather a legal malpractice lawsuit against the deficient attorney." (citation omitted)).

. This presumption is a central tenet of the Lassi-ter opinion. The presumption "against the right to appointed counsel” is stated in one form or another at least four times in the court’s opinion. See Lassiter, 452 U.S. at 26-27, 101 S.Ct. 2153 (stating of "the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty," and explaining that "[i]t is against this presumption that all the other elements in the due process decision must be measured”); id. at 27, 101 S.Ct. 2153 ("We must balance [the Eldridge factors] against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.”); id. at 31, 101 S.Ct. 2153 ("The dispositive question, which must now be addressed, is whether the three Eldridge factors, when weighed against the *297 presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status.”); id. ("If, in a given case, the parent’s interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.”). With that in mind, I cannot see how the majority can attribute to Lassiter the notion "that the presumption against the right to counsel in civil cases has 'generally' been overcome in the parental-rights termination context.” Supra ¶36. It is true that Lassiter cited cases that had "held that the State must appoint counsel for indigent parents at termination proceedings.” Id. at 30, 101 S.Ct. 2153. But I do not see how we can interpret Lassiter to have endorsed the cited cases, or to suggest that their analysis represents a proper weighing of the Eldridge factors. None of the cited cases engages in Eldridge balancing. See Dep't of Pub. Welfare v. J.K.B., 379 Mass. 1, 393 N.E.2d 406, 407-09 (1979) (failing to acknowledge the presumption or the Eldridge factors); State ex rel. Heller v. Miller, 61 Ohio St.2d 6, 399 N.E.2d 66, 70 (1980) (same); In re Chad S., 580 P.2d 983, 984-86 (Okla. 1978) (same); see also Danforth v. Maine Dep’t of Health and Welfare, 303 A.2d 794, 795 (Me. 1973) (ruling on appointed counsel issue before Eldridge created presumption against it); In re Friesz, 190 Neb. 347, 208 N.W.2d 259, 260-61 (1973) (same); Crist v. Division of Youth and Family Servs., 128 N.J.Super. 402, 320 A.2d 203, 209-11 (1974) (same); In re Myricks, 85 Wash.2d 252, 533 P.2d 841, 842 (1975) (same). And the Lassiter court does not cite these cases to illustrate the proper weighing of the Eldridge factors in the parental termination setting. The cites appear only as a background description of existing practice,
I cannot say whether the Lassiter court “lament[ed] ... th[e] state of affairs” represented by these cases. Supra ¶37. But it is beyond dispute that its holding dramatically “change[d]” the legal landscape. Id. The pr e-Lassiter cases, just cited, each concluded that due process always required the appointment of counsel in parental termination proceedings. See Danforth, 303 A.2d at 795 ("We hold that an indigent parent or parents against whom a custody petition is instituted under 22 M.R.S.A. § 3792 is entitled to have counsel appointed at the State's expense unless the right to counsel is knowingly waived.”); J.K.B., 393 N.E.2d at 408 (“[Ijndigent parents have a constitutional right to appointed counsel, if they wish, before their parental rights are terminated ...." (footnote omitted)); In re Friesz, 208 N.W.2d at 260 (''A parent’s concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right to be relinquished to the State without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer." (internal citations omitted)); Crist, 320 A.2d at 210 ("For the State to intrude permanently or only temporarily in a manner designed to disassemble the nuclear family, society’s most basic human and psychological unit, without affording counsel and guidance to a class of society's least equipped adversaries strikes the court as a fundamental deprivation óf procedural due process.”); State ex rel. Heller, 399 N.E.2d at 70 (holding that "in actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel and a transcript at public expense for appeals as of right.”); In re Chad S., 580 P.2d at 985 (“[T]he full panoply of procedural safeguards must be applied to child deprivation hearings. This includes the right to counsel[.]” (footnote omitted)); In re Myricks, 533 P.2d at 842 ("The nature of the rights in question [in a child deprivation proceeding] and the relative powers of the antagonists, necessitate the appointment of counsel”).
By contrast, the North Carolina judgment reviewed in Lassiter had concluded the opposite— that appointment of counsel was not required by the Due Process Clause. See Lassiter, 452 U.S. at 30-31, 101 S.Ct. 2153. Indeed, Lassiter notes that on the record before it, the North Carolina decision was the only "presently authoritative case” to conclude “that an indigent parent has no due process right to appointed counsel in termination proceedings.” Lassiter, 452 U.S. at 30-31, 101 S.Ct. 2153.
Against this landscape, Lassiter affirmed. In so doing, it overruled the nearly uniform consensus of cases reaching the opposite conclusion. See id. at 31-34, 101 S.Ct. 2153. The court held not only that there is a presumption against the right to appointed counsel—even in parental termination cases— but also that this presumption had not been satisfied in the case before it. Id.
The majority's approach in this case cannot be reconciled with the Lassiter opinion as a whole. On one hand, the majority claims fidelity to the presumption stated repeatedly in Lassiter. Supra ¶ 22. On the other hand, it also asserts (incorrectly, by taking a quote from Lassiter out of context) that the presumption "has 'generally' been overcome in the parental-rights termination context.” Supra ¶36. The court cannot have it both ways. Either Lassiter states a presumption against appointment of counsel or it doesn't. In my view, the entirety of the Lassiter opinion speaks unmistakably of a presumption. I see no way to read the citation to pr e-Lassiter cases as obviating everything else in the court’s articulation and application of the law.

. The point is not to diminish the relevance of "the other two factors” set forth in Lassiter. Supra ¶24 n.6. I agree with the majority that these factors also "play a role." Supra ¶24 n.6. But the point is that the first two factors are mostly static, and it is principally the third factor that will vary from case to case. So if we are to stay true to the Lassiter notion of a presumption against appointment of counsel—denying counsel except in the exceptional case—our analysis must depend most significantly on this last factor.

. This is the way that Lassiter has been understood in other jurisdictions. See In re N.A., 119 Hawai'i 28, 193 P.3d 1228, 1257 (Haw. Ct. App. 2008) (explaining that "[b]ecause the private interests of the parents and the competing interests of the government are evenly balanced, the court’s determination invariably hinges on the third factor”), abrogated by In re T.M., 319 P.3d 338, 355 (ruling that indigent parents are guaranteed appointed counsel under the Hawaii Constitution); In re Parental Rights as to N.D.O., 121 Nev. 379, 115 P.3d 223, 226 (2005) ("We expect that both the parent’s interests and the State’s interests will almost invariably be strong in termination proceedings.”); State ex rel. Juvenile Dep’t Multnomah Cty. v. Grannis, 67 Or.App. 565, 680 P.2d 660, 664 (1984) (noting that under Lassiter, "the nature of the parental interest and of the governmental interest are relatively constant and, generally, the only variable for the *300 court to consider in deciding whether to appoint counsel is the extent of the 'risk that the procedures used will lead to erroneous decisions' "); S.C. Dep't of Soc. Servs. v. Vanderhorst, 287 S.C. 554, 340 S.E.2d 149, 152-53 (1986) (applying Lassiter but only analyzing the "risk of error” prong); State ex rel. T.H. v. Min, 802 S.W.2d 625, 626-27 (Tenn. Ct. App. 1990) (holding that the interests of parents and the state in a termination-of-parental-rights proceeding are "evenly balanced" and that the risk-of-error prong was thus the "main consideration’’); but see 340 S.E.2d at 153 ("[W]e caution that under our interpretation of Lassiter cases in which appointment of counsel is not required should be the exception.").

. Under Lassiter, this concern is implicated where the risk of criminal jeopardy is "inherent” in the proceedings. See Lassiter, 452 U.S. at 31, 101 S.Ct. 2153. That is not at all tire case here. At most there is a speculative risk associated with vague charges of neglect, emotional abuse, and failure to pay child support. Even the majority concedes that that is insufficient. See supra ¶26 n.8 (speculating that "there might ... be some danger of criminal liability based on allegations in the petition to terminate L.E.S.’s rights,” but conceding that it is "not clear” that any such danger is implicated here).

. In this case, as in Lassiter, the basis for termination was a straightforward one—the assertion ■ that the parent made "less than token efforts” to communicate with the child. And that is one of those grounds on which parents are "uniquely well informed.” Lassiter, 452 U.S. at 29-30, 101 S.Ct. 2153. That will not always be the case. Our code identifies more legally complicated grounds. See Utah Code § 78A-6-507 (setting forth grounds for termination, including factually and legally complex grounds such as "the parent is unfit or incompetent").

.A principal basis for the termination of L.E.S.'s rights was parallel to the basis in Lassi-ter—the failure to communicate with the child for a significant period of time. Here there was undisputed evidence on that point. And as in Lassiter, the "weight of the evidence” on this point "was sufficiently great that the presence of counsel ... could not have made a determinative difference.” See Lassiter, 452 U.S. at 32-33, 101 S.Ct. 2153. At least L.E.S. has made no effort to show that it would have made a difference. And that is fatal under Lassiter.
It is not enough to say that L.E.S., unlike the parent in Lassiter, "has clearly shown interest in his child.” Supra ¶ 35 n.10. Showing an interest is insufficient under Utah law. To satisfy Utah law, L.E.S. was required to "communicate" with his child. See Utah Code § 78A-6-507(l)(f)(i). The undisputed evidence at trial showed that L.E.S. had failed to fulfill this requirement. And no evidence presented on appeal suggests that "the presence of counsel ,.. could ... have made a determinative difference” on this issue. L.E.S. has not identified evidence that he communicated with his child that was not presented due to missteps of counsel. That is fatal regardless of L.E.S.’s supposed "interest” in his child.

. The court claims to identify two unique features of this case that contribute to the perceived risk of error—the fact that L.E.S. was temporarily given counsel before he lost it and the fact that L.E.S. was incarcerated. Supra ¶¶31-32. But neither of these considerations meaningfully affects the complexity of the proceeding or the risk of error. Nothing in the record—or even in simple logic—supports the notion that having a lawyer for a brief period of time would make things worse than never having one at all. And the fact of incarceration clearly cannot be enough. Ms. Lassiter was incarcerated, but the court nonetheless concluded that there was an insufficient risk of error to justify appointment of counsel. Lassiter, 452 U.S. at 20, 101 S.Ct. 2153, And so this fact cannot in and of itself be determinative— unless we mean to flip the presumption set forth in Lassiter (a move we lack the authority to make).

. In the usual case the argument will be even easier than it is here. At the outset of a proceeding the exact contours of a case will be unknown. And at that stage the savvy parent will always be able to assert a potential for complexity (and thus for a risk of error).

. I agree with the majority that the task before us is to "faithfully apply Lassiter to the facts of each case,” not to make an "empirical” prediction as to the "pattern of outcomes” in the run'of the cases. Supra ¶36. And contrary to the majority’s characterization, my analysis makes no empirical claim that a proper application of the presumption in Lassiter will result in appointment of counsel only rarely. My point is not to object to any "outcomes” that may follow from our decision in this case. It is to observe that if the majority's framework will require the appointment of counsel in even the most simple, straightforward case, then we have reason to question the fidelity of that framework to the standard set forth in Lassiter.
This case is a simple and straightforward one. The court's authority to terminate L.E.S.'s rights turned on whether he made "only token efforts ... to support or communicate with the child." Utah Code § 7 8A—6—507(1) (f) (i). It is difficult to envision a legal issue in the termination of parental rights context that could be more straightforward and accessible than this one. It is equally difficult to identify a subject matter over which a parent would have greater knowledge. If, as the majority holds, the Lassiter presumption is overcome in this case, it is hard to conceive of a parental-termination case in which the presumption would not be overcome. And if appointed counsel is effectively required in every parental-termination case under the majority’s framework, then we have circumvented the Lassiter presumption while still paying homage to it. The predicted "pattern of outcomes,” in other words, is troubling not because the outcomes are objectionable, but because the revealed pattern suggests that we have not in fact "faithfully applied] Lassiter." Supra ¶36. Perhaps there is circular comfort in insisting that "whatever pattern of outcomes emerges ... is the pattern of outcomes required by the law.” Supra ¶36. But Lassiter prescribes a presumption against the appointment of counsel in parental termination cases. So if the majority’s approach demands appointment in the run of the mill case, we have reason to question the compatibility of that approach with "the law” as stated in Lassiter.
The majority insists that "even if” appointment of counsel will be required in many cases, such a result stems not from our application of the Lassiter test but "from the existence of a statutory right to counsel under Utah Code section 78A-6—1 111(l)(c).” Supra ¶38 n.ll. But the statutory right to counsel in state-initiated proceedings tells us nothing about the existence of a constitutional right to counsel in privately filed cases. The majority's contrary conclusion confuses the due process inquiry by importing elements of L.E.S.'s equal protection claim—which the court purports to avoid. See supra ¶22 n.4. L.E.S.'s due process right to counsel under Lassiter is not at all affected by the legislature's decision to afford counsel in state-initiated cases. And regardless of whether the case was filed by the state or by a private party, the question is whether the Lassiter factors weigh in favor of a right to appointed counsel. In any event, when determining whether a constitutional right to counsel exists, I see no reason to conclude that the Lassiter test would result in the denial of counsel in a large number of state-initiated cases, as the majority *302 suggests. Supra ¶38 n.11. In those cases, as with privately initiated cases, the key question would be the complexity and difficulty of the case. And counsel would be required as a matter of due process only in cases in which counsel is necessary to avoid a substantial risk of error.

. In our past cases, we have adverted to claims under the Due Process Clause of the Utah Constitution. See In re Adoption of J.S., 2014 UT 51, ¶ 42, 358 P.3d 1009, cert. denied sub nom. Bolden v. Doe, — U.S. -, 136 S.Ct. 31, 193 L.Ed.2d 24 (2015); State v. Munguia, 2011 UT 5, ¶¶ 15-18, 253 P.3d 1082; Wells v. Children's Aid Soc’y of Utah, 681 P.2d 199, 204 (Utah 1984); Untermyer v. State Tax Comm'n, 102 Utah 214, 129 P.2d 881, 885 (1942). But there is no established standard for state due process that differs from the standard(s) articulated by the U.S. Supreme Court under the United States Constitution. See In re Adoption of J.S., 2014 UT ¶ 57, 358 P.3d 1009 (repudiating the formerly heightened state due process standard articulated in Wells, 681 P.2d 199). I would address the state due process question here because I conclude that L.E.S.’s federal claim falls short.

. State v. Houston, 2015 UT 40, ¶¶ 148-57, 353 P.3d 55 (Lee, A.C.J., concurring) (making the case for originalist interpretation of the Utah Constitution and rebutting critiques of this methodology).

. Too often the briefing on a novel question of constitutional law takes the form of a pure policy argument. A typical argument on an issue of state constitutional law would take the following form: (a) the Utah Supreme Court is not bound to follow the U.S. Supreme Court’s construction of similar or analogous provisions of the United States Constitution in our interpretation of the Utah Constitution, (b) federal precedent is inadequate because it fails to advance some particular policy concern of importance to the claimant, and (c) therefore, this court should embrace an expansionist view of state constitutional law that advances the claimant’s policy concern. A few of our precedents even seem to encourage this type of analysis. See, e.g., Soc’y of Separationists, Inc. v. Whitehead, 870 P.2d 916, 921 n.6 (Utah 1993) ("We have encouraged parties briefing state constitutional issues to use historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question.” (emphasis added)). But the conclusion can hardly follow from the premise. In interpreting the constitution, we must be interpreting the constitution— and not just vindicating policy concerns that we deem important. Houston, 2015 UT ¶¶ 154-57, 353 P.3d 55 (Lee, A.C.J., concurring) (noting that the court must construe constitutional terms “as originally understood” and that "[a] constitution rooted in 'evolving standards’ arising out of a judge's ‘humanitarian instinct’ is no constitution at all”). To do so we must examine the text of the operative document and begin with its original meaning.

. See William D. Guthrie, Constitutionality of the Sherman Anti-Trust Act of J890, 11 Harv. L. Rev, 80, 84 (1897) (noting that the "historic term, 'due process of law,’ or its equivalent, 'the law of the land,' ” has shielded people from oppression and embodied "the foremost of our liberties" for centuries).

. Jane Rutherford, The Myth of Due Process, 72 B.U. L. Rev, 1, 9 (1992) (footnotes omitted).

. See Wynehamer v. People, 13 N.Y. 378, 426 (1856) (characterizing the guarantee of due process as "law in its regular administration through courts of justice” (citation omitted)); Harbison v. Knoxville Iron Co., 103 Tenn. 421, 53 S.W. 955, 957 (1899) ("What, then, is 'due process of law,’ or 'the law of the land’? The two phrases have exactly the same import, and that which is entitled to recognition as the one is to be recognized as the other also.”), aff'd, 183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55 (1901); Rowan v. State, 30 Wis. 129, 148 (1872) (“due process” and "law of the land” mean the same thing). This was also the understanding of "due process” that prevailed at the time of the ratification of the Fourteenth Amendment. See Cong. Globe, 37th Cong., 2d. Sess. 345-49 (1862) (statement of Rep. Bingham, a sponsor of the amendment) (pointing to existing caselaw on the subject and explaining that due process of law was a synonym for the phrase "law of the land”); see also Akhil Reed Amar, The Bill of Rights and the Fourteenth Amendment, 101 YALE L.J. 1193, 1225 (1992) (discussing Bingham’s remarks and the prevailing understanding of the phrase “due process” at the time of the ratification of the Fourteenth Amendment).

. See generally Andrew T. Hyman, The Little Word “Due", 38 Akron L. Rev. 1 (2005).

. See Betts v. Brady, 316 U.S. 455, 470 n.26, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) (citing state statutes of twelve states providing for appointed counsel for capital cases or cases of felony or other grave crime in the 1800s).

. See generally John MacArthur Maguire, Poverty and Civil Litigation, 36 Harv. L. Rev. 361, 388 (1923) (noting that as of the 1920s only a dozen states "g[a]ve their courts power to assign lawyers to needy suitors” and twenty states had no in forma pauperis provisions for the poor at all). And in those states that had provisions for the appointment of an attorney for indigent parties in civil suits, payment frequently was not guaranteed. See Bd. of Comm'rs of Howard Cty. v. Pollard, 153 Ind. 371, 55 N.E. 87, 87 (1899). So those appointed could refuse by arguing that such an appointment would be an unconstitutional commandeering of services. See Blythe v. State, 4 Ind. 525, 525 (1853).

.See Betts, 316 U.S. at 470-71, 62 S.Ct. 1252 (observing that "the matter has generally been deemed one of legislative policy").